Barney SAXON, Plaintiff,

v.

AUTOMATIC RETAILERS OF AMER-
ICA, INC., a corporation, Defendant.

Civ. A. No. 66–328–S.

United States District Court,
N. D. Alabama, S. D.

April 25, 1970.

R. Clifford Fulford, of Levine, Ful-
ford & Pope and Robert C. Garrison,
Birmingham, Ala., for plaintiff.

Robert G. Tate of Thomas, Taliaferro,
Forman, Burr & Murray, Birmingham,
Ala., for defendant.

MEMORANDUM OPINION

LYNNE, Chief Judge.

This diversity action was brought in-
itially for an alleged breach of a stock
option agreement and the complaint as
originally filed asks alternately for ei-
ther specific performance or a money
judgment. As amended, however, the
complaint also seeks reformation of the
written option contract and the question
of whether reformation will be allowed is
presently before the court.

During 1960, plaintiff and several oth-
er persons, including John DeBuys, Har-
ry DeBuys, and Donald Hamre, were
associated together in the vending busi-
ness in Alabama.[1] This business was
carried on through eight Alabama cor-
porations.[2] Plaintiff owned a substan-

1. See 1 Tr. at 3–4.

2. These corporations were: Roe Cigarette
Service, Inc., Roe Vending Co., Inc., Su-
per Vending Company, Inc., Vending En-
gineers, Inc.; Automatic Food Services;

Automatic Food Services of Mobile; Mo-
bile Vending Company, Inc.; and South-
ern Cigarette Service, Inc. See Exhibit
1 to Defendant's Request for Admissions
filed Nov. 28, 1966 (agreement for the
purchase and sale of stock of first four

tial stock interest in five of these corporations,[3] but was a resident of Florida, had a vending business of his own there,[4] and evidently took no active part in the management or operation of the Alabama corporations.[5]

In August or September of 1960,[6] merger negotiations were initiated between representatives of Automatic Retailers of America, Inc. (hereinafter referred to as ARA),[7] defendant herein, and the owners of the Alabama vending corporations above referred to.[8] Preliminary negotiations were conducted primarily by Harry DeBuys for the Alabama companies,[9] and David Dayton for ARA.[10]

Negotiations reached a serious stage in late November 1960, when a meeting between representatives of ARA and persons speaking for the Alabama companies was scheduled in Birmingham on December 2, 1960, for the purpose of drawing "up a letter of intent for all parties to sign and also [to] nail down details of how the companies will be sold, etc." [11]

This meeting was held at the Guest House Motor Inn on December 2. Both the Alabama companies and ARA were well represented at this meeting. Present for ARA were: William G. Burns, Chicago attorney; Donald Wales, vice-president and director of ARA; Herman G. Minter, treasurer of ARA; and David D. Dayton, vice-president of ARA.[12] Harry DeBuys was the primary negotiator for the owners of the Alabama companies, including the plaintiff, Barney Saxon.[13] Also, however, from the evidence it appears reasonably certain that Charles H. Moses, an accountant for the Alabama corporations, Robert Garrison, attorney for the DeBuys brothers and on retainer from Automatic Food Services,[14] Donald Hamre,[15] and the plain-

companies mentioned above); Exhibit 2 to Defendant's Request for Admissions filed Nov. 28, 1966 (plan of reorganization and agreement for the exchange of stock of last four companies mentioned above). Hereinafter, these eight companies will be collectively referred to as the "Alabama companies" or the "Alabama corporations." Additionally, it might be noted that there is some indication in the proposed findings of fact submitted by plaintiff that some of the vending operations were partnerships. See Plaintiff's Proposed Findings of Fact, Conclusions of Law and Final Judgment at 2. However, the above-cited exhibits show on their face that all of the companies were Alabama corporations.

3. Plaintiff's interest was in Roe Cigarette, Roe Vending, Super Vending, Vending Engineers and Southern Cigarette. The other three corporations were wholly owned by the DeBuys brothers. See Exhibit 1 to Defendant's Request for Admissions, supra note 2, at 3–4, Exhibit 2 to Defendant's Request for Admissions, supra note 2, at 4.

4. See 1 Tr. at 50.

5. See Plaintiff's Proposed Findings of Fact, Conclusions of Law and Final Judgment at 2.

6. See 1 Tr. at 7–8.

7. After the institution of this suit, Automatic Retailers of America, Inc.'s name was changed to ARA Services, Inc. See Conclusions of Law and Final Judgment Plaintiff's Proposed Findings of Fact, at 1.

8. See 1 Tr. at 7–8.

9. See 1 Tr. at 7–8, 12, 52.

10. See 2 Tr. at 4. Dayton had owned vending companies in Tennessee prior to the fall of 1960, but had merged them with ARA and had become its vice-president in charge of its Southern Region. Compare 1 Tr. at 7 with 2 Tr. at 3.

11. Letter from D. D. Dayton to Harry DeBuys, Nov. 25, 1960 (Plaintiff's Exhibit 2). See Letter from Automatic Retailers of America, Inc., by D. J. Davidson, to Harry DeBuys, John DeBuys and F. D. Hamre, Nov. 23, 1960 (Plaintiff's Exhibit 1).

12. See letters referred to in note 11 supra.

13. See 1 Tr. at 12, 32, 52–53, 64–66. The evidence is clear without dispute that Harry DeBuys acted as plaintiff's agent in these negotiations, especially with respect to the stock options from which this controversy arises.

14. See id. at 32.

15. See letter from Automatic Retailers of America, supra note 11.

tiff [16] were present at the Guest House for at least a part of the time the December 1960 negotiations were in progress.

In substance, the agreement that resulted from the negotiations up to and during January 1961 provided that: all of the stock of four of the Alabama companies would be purchased for $434,640.00; [17] all of the stock of the other four Alabama corporations would be acquired by ARA by the exchange of 42,600 shares of ARA common for such stock; [18] as an "additional sweetener for the acquisition," [19] an option to purchase 6,000 [20] shares of ARA stock would be granted to the Alabama owners and could be divided by them in any manner they pleased; [21] the Alabama owners would enter into employment contracts with ARA and such contracts would contain, among other things, a "non-compete" clause. After some minor alterations, written contracts embodying in substance all that had been previously agreed upon were executed by the parties on February 7, 1961. [22]

As clearly appears from the documents executed on February 7, 1961, plaintiff received in return for transferring his interest in the Alabama companies to ARA, $99,940 cash, 6,150 shares of ARA common, an option to purchase 2,300 shares of ARA common at $39.425 per share under conditions set out in the stock option certificate, and a three-year employment agreement under which plaintiff was to receive $1200 per year and serve as a consultant to ADA. [23]

Plaintiff evidently did not take his employment with ARA seriously, [24] did not request an extension of the period of employment, as did the DeBuys brothers who were employed by ARA under similar agreements, [25] and as a result on February 6, or 7, 1964, plaintiff's employment with ARA expired pursuant to the terms of the employment agreement executed on February 7, 1961. [26]

Prior to the expiration of his employment, plaintiff had not attempted to exercise his stock options. Indeed, according to his own testimony he had placed the papers concerning the transaction in a safe, and had forgotten about them. [27] During the period from 1961 through 1964, the market price of ARA stock had been depressed, and was usually a few points below the option price. However, the value of such stock in 1966 rose several points above the option price. [28] Sometime in the spring of that

16. See 1 Tr. at 55.

17. See Exhibit 1 to Defendant's Request for Admissions, supra note 2, at 2.

18. See Exhibit 2 to Defendant's Request for Admissions, supra note 2, at 2.

19. 1 Tr. at 18.

20. As a result of further negotiations, the number of shares subject to option was raised from 6,000 to 9,000. See 1 Tr. at 18, 21–22, 52.

21. See id. at 17.

22. See Exhibits 1 & 2 to Defendant's Request for Admissions, supra note 2 (agreements for exchange of stock and purchase of stock) ; Exhibits A & B to Plaintiff's Request for Admissions filed Aug. 8, 1966 (stock option certificate and employment agreement between plaintiff and defendant).

23. See documents described in note 22 supra.

24. See 1 Tr. at 66–67. Plaintiff testified that his employment contract was a "laughing matter" and that he did not want employment in the first place, and that he had not attempted to renegotiate the contract or continue his employment with ARA. Id.

25. The DeBuys brothers sometime after February 1961, renegotiated their employment contracts with ARA so that they would receive less salary, but would be employed for a longer period of time. See 1 Tr. at 37–39.

26. Compare Exhibit B to Plaintiff's Request for Admissions, supra note 22, with Letter from William J. O'Kane to Barney E. Saxon, April 4, 1966.

27. See 1 Tr. at 62.

28. See Exhibit E to Plaintiff's Request for Admissions, supra note 22; Defendant's Exhibit 4; Brief of Defendant at 15.

year Harry DeBuys, John DeBuys and Don Hamre exercised their options and Harry advised plaintiff to do likewise.[29] On or about April 1, 1966, plaintiff attempted to exercise his option, but was not allowed to do so by defendant ARA because of its contention that under section II of the stock option certificate, plaintiff's right to "exercise any of the options granted * * * terminated three months after the date of the termination of * * * employment." [30]

On May 20, 1966, the plaintiff filed his complaint herein alleging that on February 7, 1961, defendant had granted to plaintiff an option to purchase 2,300 shares of defendant's common stock at a price of $39.425 per share and that plaintiff had performed the conditions of such contract but that defendant had breached it by refusing to sell said shares to the plaintiff.

In answer to the complaint, the defendant admitted that it had granted such option to the plaintiff, but denied that the plaintiff met or had performed the conditions imposed upon him in order to exercise the option and denied that the defendant had breached its obligations under it. The defendant also affirmatively asserted that the option required the plaintiff to be employed by the defendant in order to exercise the option, and that this condition was not complied with by the plaintiff. Defendant further asserted that plaintiff's attempted tender of the option price was insufficient under the requirements of the option.

Subsequent to the filing of defendant's answer, both parties filed requests for admissions and interrogatories to each other and each party made responses and answers thereto. On December 21, 1966, the plaintiff served on counsel for defendant a motion for summary judgment, or judgment on the pleadings, and on December 29, 1966, the defendant filed a cross-motion for a summary judgment.[31] On January 20, 1967, this court entered an order taking under submission the motions for summary judgments on briefs submitted therewith, and stated:

> If the court concludes that the provisions of the stock option certificate and employment agreement are clear and unambiguous, a partial summary judgment will be entered herein. If judgment adverse to plaintiff is rendered, leave will be granted to plaintiff to amend his complaint to seek a reformation of such contracts if he is so advised.

Subsequently, on October 25, 1968, the court entered an order on the motions for summary judgment stating that the option agreement was clear and unambiguous and granting the defendant's motion for summary judgment.[32] Plaintiff was given leave to amend his complaint.[33]

On November 22, 1968, plaintiff amended his complaint to state a cause of action for reformation of the written stock option agreement and alleged with some specificity why his "stock option certificate" [34] "failed to reflect the true

---

29. See 1 Tr. at 30–31.

30. See Letter from William J. O'Kane, supra note 26.

31. The plaintiff's motion for summary judgment or judgment on the pleadings was not filed with the clerk of this court until January 3, 1967.

32. The basis of the court's action in granting summary judgment for defendant was paragraph 2 of the stock option agreement which the court construed as limiting plaintiff's rights under the option to purchase within three months that num-

ber of shares "immediately purchasable" by him at the date of his termination of employment. See Order Granting Defendant's Motion for Summary Judgment and Attached Memoranda, filed October 25, 1968.

33. The statement of the case contained in the four preceding paragraphs has been taken almost verbatim from the post-trial brief of defendant. See Brief of Defendant at 2–3.

34. See Exhibit A to Plaintiff's Request for Admissions, supra note 22.

intent and agreement of the parties."[35] The allegations in the amendment included the following:

It was intended and agreed by Plaintiff and Defendant that, despite the fact that Plaintiff was to be employed for only three years, he was to have his said stock options, exercisable at the same times and in the same manner as John DeBuys, Harry DeBuys and F. Donald Hamre, i. e. over a period of five years. Plaintiff's said form "Stock Option Certificate" as finally drafted failed to express the intent and agreement of the parties in that said form failed to grant to Plaintiff the options intended by the parties. Said form "Stock option [sic] Agreement" should be reformed.[36]

Defendant, in its answer to the amended complaint, joined issue with plaintiff by denying that it "was intended and agreed by plaintiff and defendant that plaintiff was to have the right to exercise said stock options over a period of five years even though he was not employed by the defendant" and asserted that if there were any mistake relating to this matter, it was a unilateral mistake on the part of plaintiff.[37]

The case was set for trial on June 26, 1969. At that time oral testimony was presented through the witnesses, Harry DeBuys, Robert Garrison, Barney Saxon, the plaintiff, David Dayton, and a number of exhibits were also introduced into evidence. Upon conclusion of the trial, the court took the matter under submission and requested factual briefs from the parties.

Thereafter, plaintiff on July 23, 1969, filed a Rule 15(b) motion to further amend his complaint "to conform to the evidence presented and received on the trial * * *[38] The plaintiff in the amendment submitted attempts to set up an equitable estoppel theory of reformation by alleging in substance that plaintiff was induced to transfer his interests in certain automatic vending business corporations to plaintiff and part of the consideration for this transfer was exercisable options for 2,300 shares of defendant's stock at $39.425, but that in the written documents supposedly embodying this agreement, drawn by defendant and presented to plaintiff for his signature, defendant intentionally omitted to give plaintiff such agreed consideration, and plaintiff was mistaken as to the contents of such instruments when he signed them.[39]

On the same day as the motion to further amend was filed, defendant objected to the allowance of the amendment on the grounds that the issues raised thereby were not tried by either the express or the implied consent of the parties and that to allow the amendment would prejudice the defendant because it did not have opportunity to meet such questions with evidence.[40] After examining the recorded testimony herein and the exhibits submitted at trial, the court is of the opinion that such issues were tried by the implied consent of the parties and that the amendment should be allowed. For reasons hereinafter appearing, the allowance of such amendment does not prejudice the rights of defendant.[41]

Succinctly stated, plaintiff's contention at this stage of the litigation is that the agreement in fact between him and defendant was that he was to have "exercisable" options to purchase 2,300 shares regardless of his termination of employment and that the provisions of the stock option certificate did not reflect this understanding due either to the

---

35. See Amendment to Complaint filed Nov. 22, 1968, at 3.

36. Id. at 4.

37. See Answer, filed Feb. 7, 1969, at 2, 4.

38. Motion to Amend Complaint, filed July 23, 1969, at 1.

39. See id. at 1–2.

40. See Defendant's Objections to Plaintiff's Motion to Amend Complaint, filed July 23, 1969, at 1–2.

41. Amendments of this nature should be freely allowed, as long as there is no prejudice to the opposing party. See 3 J. Moore, Federal Practice ¶ 15.13 [2], at 985 (2d ed. 1968).

mutual mistake of the parties or the unilateral mistake of the plaintiff coupled with such inequitable conduct by defendant as to justify reformation of the stock option certificate.[42]

The evidence presented at the trial of this case, when measured against the high standard of proof required in reformation cases [43] and the presumption of correctness of the written stock option certificate,[44] does not establish either mutual mistake of the parties or unilateral mistake on the part of plaintiff coupled with conduct on the part of defendant sufficient to justify reformation.[45] In the absence of mutual mistake, or unilateral mistake connected with inequitable conduct, which causes a written instrument, such as the stock option certificate herein, to fail to express

42. See Plaintiff's Proposed Findings of Fact, Conclusions of Law and Final Judgment at 11–12, 16.

43. In an action to reform a document, the burden is on the complaining party to establish his case by "clear, convincing and satisfactory evidence." Fidelity Service Ins. Co. v. A. B. Legg & Sons Burial Ins. Co., 274 Ala. 94, 145 So.2d 811, 815 (1962). See Moragne v. Moragne, 234 Ala. 660, 176 So. 455, 457, wherein it was stated that "[c]ourts should use great caution and require a high degree of proof in cases of reformation of written instruments. * * *" Accord, Taylor v. Burns, 250 Ala. 218, 34 So.2d 5, 6 (1948) ; Hyatt v. Ogletree, 31 Ala.App. 8, 12 So.2d 397, 399 (1942); Great Atlantic & Pacific Tea Co. v. Engel Realty Co., 241 Ala. 235, 2 So.2d 425, 427 (1941). Furthermore, although there is a split of authority on the matter, "it is generally held that the testimony of a witness or party is insufficient to justify reformation unless it is corroborated by other witnesses or by facts and circumstances." 76 C.J.S. Reformation of Instruments § 84, at 461 (1952).

44. There is a presumption that "the contract as executed, contains the conclusion of all previous negotiations on the subject, and is the final agreement of the parties." Kilgore v. Redmill, 121 Ala. 485, 25 So. 766, 767 (1899). Accord, 76 C.J.S. Reformation of Instruments § 82, at 447 (1952). See also, McGregor v. McGregor, 254 Ala. 378, 48 So.2d 312 (1950).

45. Clearly, the evidence submitted herein does not support the court's findings of mutual mistake which has been defined by the Fifth Circuit to mean one "which is reciprocal and common to both parties, each alike laboring under the same misconception in respect to the terms of the written instrument." Stevens v. Illinois Central RR, 234 F.2d 562, 564 & n. 4 (1956). The testimony of David Dayton indicates that ARA was fully aware of the terms of the stock option certificate and its requirement of employment as a condition of exercise. See 2 Tr. at 6–13. Further, there was no agreement on ARA's part with anyone that "the stock option certificate would be exercisable in any other manner than what was provided therein." 2 Tr. at 13. Also, both plaintiff and ARA officials evidently recognized that options to buy ARA stock were designed to achieve maximum tax benefits. See Tr. at 5.

> There are two general types of employee stock options—statutory and nonstatutory. The statutory options, "qualified and restricted" options and options issued under employee stock purchase plans, give the employee the advantage of realizing no income until he disposes of the stock which he acquired under the option. This advantage is not available to the employee who receives a nonstatutory option. He will nearly always realize income when he exercises the option.

CCH Fed.Tax Rep. ¶ 2675, at 30,003 (1969). In this regard, it is significant to note that to "qualify for the special tax treatment applicable to statutory stock options * * * the optionee must be an employee of the granting corporation or of its parent or subsidiary and must remain in employment of the grantor or a related corporation up to at least three months prior to the time he exercises the option." Id. at ¶ 2683.02. Certainly, it cannot be reasonably contended, and the evidence does not show, that ARA undermined its restricted stock option scheme by agreeing with plaintiff that he could exercise his option for 2,300 shares regardless of whether he continued his employment with ARA.

If plaintiff was laboring under any mistake, it was a unilateral mistake as to the effect of the three year employment agreement upon the restricted stock option, which was all plaintiff bargained for, and all that he received. See generally 1 Tr. at 19, 33–34, 52–53. There is no evidence in the record to indicate to the court that ARA engaged in any fraud or inequitable conduct sufficient to estop it from denying the lack of mutual mistake.

*the true agreement of the parties to it,* reformation should not be allowed.[46]

Accordingly, the court finds from the evidence that plaintiff has totally failed to establish a case for reformation of the stock option agreement on either a mutual mistake or an inequitable-conduct-equitable-estoppel rationale and contemporaneously herewith an order of judgment for defendant will be entered.

---

46. Assuming *Erie* principles to govern here, Alabama substantive law is applicable in this action. Ala.Code tit. 9 § 59 (1958) provides as follows:

When contract may be revised.—When, through fraud, or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court of equity on the application of the party aggrieved, so as to express that intention, so far as it can be done without prejudice to the rights acquired by third persons, in good faith and for value.

This section and its counterpart, Ala. Code tit. 47 § 136 (1958), are declaratory of the common law of reformation of written instruments. See American Liberty Ins. Co. of Birmingham v. Leonard, 270 Ala. 17, 115 So.2d 470, 473 (1959); City of Oneonta v. Sawyer, 244 Ala. 25, 12 So.2d 82, 83 (1943); American-Traders' Nat. Bank v. Henderson, 222 Ala. 426, 133 So. 36, 38 (1931). The purpose of allowing reformation of a written instrument is to make such instrument speak the true intent of the parties, and therefore, before reformation may be properly allowed, there must have been a meeting of minds of the parties. The court cannot make a new contract for the parties "or establish as a contract between them that which it is supposed they would have made had they understood the facts." American Liberty Ins. Co. of Birmingham v. Leonard, 270 Ala. 17, 115 So.2d 470, 474 (1959). See also Atlas Assur. Co., etc. v. Byrne, 235 Ala. 281, 178 So. 451 (1938); 76 C.J.S. Reformation of Instruments § 4, at 329 (1952). Under Alabama law, then, and evidently under general principles of reformation common to most jurisdictions in the United States, there are only three situations in which a party to a written contract can have such contract revised or reformed:

(1) Because of mutual mistake of both parties to the contract, the contract fails to express the intention of the parties; (2) because of a unilateral mistake on the part of one of the parties, which the other party knew or suspected, the contract fails to express the intention of the parties; or (3) because of fraud the contract fails to express the intention of the parties.

American Liberty Ins. Co. of Birmingham v. Leonard, 270 Ala. 17, 115 So.2d 470, 475 (1959). Plaintiff in the instant case has failed to prove facts sufficient to bring himself within these requisites of reformation.